**United States Court of Appeals**
**FOR THE EIGHTH CIRCUIT**

_____

No. 97-1486
_____

| | |
|---|---|
| Debra L. Herr, | * |
| | * |
|     Plaintiff - Appellant, | * |
| | *   Appeal from the United States |
|     v. | *  District Court for the |
| | *  Eastern District of Missouri. |
| Airborne Freight Corporation, | * |
| | * |
|     Defendant - Appellee. | * |

_____

Submitted:  September 9, 1997
Filed:   December 12, 1997
_____

Before FAGG, LAY, and LOKEN, Circuit Judges.
_____

LOKEN, Circuit Judge.

Debra Herr appeals the district court's[1] grant of summary judgment dismissing her federal and state law claims of sex discrimination against her former employer, Airborne Freight Corporation. See Herr v. Airborne Freight Corp., 950 F. Supp. 273 (E.D. Mo. 1996). The issue on appeal is whether Herr presented sufficient evidence that Airborne's reason for failing to give her work and then discharging her as a temporary driver was a pretext for intentional sex discrimination. See Ryther v. KARE

_____

[1]THE HONORABLE GEORGE F. GUNN, JR., United States District Judge for the Eastern District of Missouri.

11, 108 F.3d 832, 836-38, 848 (8th Cir.), cert. denied, 117 S. Ct. 2510 (1997), construing St. Mary's Honor Center v. Hicks, 113 S. Ct. 2742, 2749 (1993), and Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254-56 (1981).[2] After reviewing the district court's grant of summary judgment de novo, viewing the evidence in the light most favorable to Herr, see Hutson v. McDonnell Douglas Corp., 63 F.3d 771, 775 (8th Cir. 1995), we affirm.

## I.

Airborne employs truck and van drivers to deliver time-sensitive packages. Airborne drivers work under the National Master Freight Agreement, a multi-employer collective bargaining agreement between Airborne, other cartage companies, and the International Brotherhood of Teamsters. Under this Agreement, Airborne's full-time and part-time permanent drivers have regular delivery routes and are guaranteed a minimum number of work hours each week. Airborne routes are distributed to permanent drivers through a bi-annual bidding process. A driver's seniority for bidding purposes runs from his or her date of hire as a permanent driver.

All new Airborne drivers are probationary employees. During their first thirty days, probationary drivers need not join the Union, and their employment is terminable at will by Airborne. Drivers who successfully complete this probationary period become "casual" drivers. Casual drivers fill in for permanent drivers who are absent, ill, or on vacation. Casual drivers must join the Union and pay union dues for any month in which they work at least one day. However, they have no seniority rights under the collective bargaining agreement -- Airborne has unfettered discretion to decide who will fill in for absent permanent drivers and who will be invited to bid on

---

[2]These federal cases govern Herr's claims under the Missouri Human Rights Act as well as her Title VII claims. See Midstate Oil Co. v. Missouri Comm'n on Human Rights, 679 S.W.2d 842, 845-46 (Mo. banc 1984).

new or unclaimed permanent routes.  When a permanent driver is absent, the supervisor on duty consults a list of casual drivers and calls the driver that the supervisor thinks is best able to complete the available route.  Thus, the ranks of Airborne casual drivers may include some who are never chosen for temporary work assignments and will never be asked to bid for permanent routes.  Airborne supervisors periodically purge these unwanted temporary employees from the official list of casual drivers, with no written notice of that action to the now-terminated casual driver.

Supervisor Jeff Bruer hired Herr and gave her a brief orientation in March or April of 1992.  Her thirty-day probation began on May 6 when she reported for work at Airborne's facility at the St. Louis airport.  After two or three days learning to sort packages and assisting permanent drivers with deliveries, Herr was assigned a route often used to train probationary employees.  Herr admits she was unable to finish that route on time.  Bruer recalls assigning Herr to a route for one week and then cutting that assignment short when she failed to finish the route two or three times.  Herr recalls working various routes during her second and third weeks of probation but cannot recall specific assignments.

According to Herr, Bruer told her on May 21 that she had satisfactorily completed probation and could call in for work as a casual driver on the following Monday.[3]  Herr did so and was told there was no work available.  She called Airborne every week in June and July of 1992 and periodically until 1994 but was always told there was no work available.  When she finally pressed for an explanation, Herr was told in March 1994 that she had been discharged.  The Union filed a grievance on her behalf.  Airborne produced a June 1992 document stating that she was terminated for unsatisfactory job performance and listing May 21, 1992, as her last day of work.  The grievance was then dismissed as untimely, and the Union did not appeal.

---

[3]May 21 would have been only half way through Herr's thirty-day probation period, but we credit this testimony for summary judgment purposes.

Herr filed this action in December 1995, claiming that Airborne failed to give her work as a casual driver and discharged her on account of her sex. In response to Airborne's motion for summary judgment, Herr alleged that Airborne's proffered explanation of unsatisfactory job performance is a pretext for sex discrimination. Her theory is that Airborne hired and inadequately trained her only to be an entry in its employment records, in other words, to inflate Airborne's roster of women drivers. In support of this theory, Herr avers that, when she complained to a union shop steward in 1994, he told her that she was an "illusion," that Airborne never intended to give her any work.[4] In addition, emphasizing that she was not notified of discharge until March 1994, Herr asserts that Airborne's termination document must have been back-dated. She reasons that even if there was an administrative breakdown in notifying her, someone would have told her when she kept calling in looking for work, if she had in fact been terminated in June 1992.

## II.

Herr's sex discrimination claim has two components, Airborne's failure to assign her work as a casual driver, and its decision to terminate.

**A.** Herr's failure-to-assign-work claim must overcome two undisputed facts -- she failed to complete assigned routes while on probation, and Airborne has unfettered discretion under the collective bargaining agreement to assign casual drivers as much

---

[4]This statement by a third party would be inadmissable hearsay if offered in this form at trial. As Herr has not shown that the shop steward would be available as a trial witness, she may not rely on this statement in opposing summary judgment. See Pink Supply Corp. v. Hiebert, Inc., 788 F.2d 1313, 1319 (8th Cir. 1986); 11 MOORE'S FEDERAL PRACTICE ¶ 56.14[1][d] (Matthew Bender 3d ed. 1997). Moreover, the statement is highly ambiguous, particularly given the Union's lack of concern with probationary and casual drivers as reflected in the collective bargaining agreement. Thus, we disregard it.

or as little work as it chooses. Herr responds by alleging that Airborne gave her inadequate training and no assignments because it only pretends to hire women drivers. However, she presented no evidence that any other probationary driver received more training. Title VII and the Missouri Human Rights Act do not require that Airborne provide a particular level of new employee training, only that women be given equal employment opportunities. See Smith v. Monsanto Chemical Co., 770 F.2d 719, 723 n.3 (8th Cir. 1985), cert. denied, 475 U.S. 1050 (1986). Moreover, Herr's assertion that Airborne did not genuinely employ women drivers is contrary to undisputed portions of the summary judgment record. The woman who referred Herr to Airborne in 1991, Kelly Hotchkiss, was then a casual driver and is now a permanent Airborne driver. Between 1991 and 1996, Airborne hired twenty-one women drivers in St. Louis. Twelve remain Airborne drivers, and four others were terminated during probation. There is no evidence that Airborne's male drivers suffered less attrition during this period.

Lacking evidence of systematic discrimination in Airborne's hiring and training of women drivers, Herr's failure-to-assign-work claim fails because Airborne had no obligation to assign her temporary work. Herr canvassed other women drivers informally and could muster no credible evidence that Airborne supervisors have used their discretion to discriminate against women casual drivers. The only other example of a woman who survived probation but was not given casual work, Paula Cox, admitted that she, too, was unable to deliver packages in a timely manner. There is no evidence that any casual male driver failed to make timely deliveries yet continued to receive casual work. Thus, the district court properly dismissed Herr's failure-to-assign-work claim. Indeed, as to this claim, Herr failed to present a prima facie case of intentional sex discrimination.

**B.** Turning to the wrongful termination claim, we note at the outset the unusual nature of this claim. As we have explained, Airborne's supervisors lawfully elected not to assign Herr work as a casual driver. It is likewise apparent that she would never

have been invited to bid on a permanent route and acquire seniority as a permanent driver.  In these circumstances, her "termination" was a mere formality -- the excising of a redundant name from Airborne's official list of casual drivers that had no financial impact on Herr.  Indeed, she admitted as much when she applied for and began collecting unemployment insurance in early June 1992.  Herr nonetheless argues that she presented sufficient evidence to convince a reasonable fact finder that Airborne's stated reason for discharge, unsatisfactory job performance, was a pretext for intentional discrimination.  She reasons that Airborne's failure to notify her of discharge, and its use of an allegedly back-dated termination document, are sufficient to infer intentional discrimination.

Regarding Airborne's failure to notify, Herr asks how she could have called Airborne every week in the months of June and July of 1992, and then again with some frequency into 1994, without being told she had been discharged.  Jeff Bruer testified that he would ordinarily tell a casual driver of termination, but that he could not remember whether or not he notified Herr.  Crediting Herr's testimony that she was not  told of the termination, the fact remains that Airborne has little reason to formally terminate casual drivers because they only work when they are given work.  Airborne's lack of a policy to notify unwanted casual drivers that they have been terminated may be an unkind business practice, but it is not evidence of sex discrimination.  Likewise, absent evidence that Airborne back-dated Herr's termination document, and there is no such evidence, that document is consistent with Airborne's non-discriminatory description of its business practices -- an internal business record used to remove an unwanted casual driver from the official list that only came to light in this case when the Union filed a grievance on Herr's behalf.

Herr also argues that she was not given a second chance to perform the job satisfactorily, contrasting her treatment with numerous letters disciplining, but not discharging, male permanent drivers who committed work-related infractions.  But Herr cannot meet her burden of proving that she was similarly situated to these male

-6-

employees in all relevant respects.  <u>See</u> <u>Harvey v. Anheuser-Busch, Inc.</u>, 38 F.3d 968, 972 (8th Cir. 1994).  Herr's poor performance occurred when she was a probationary driver, unprotected by the collective bargaining agreement and its discipline process that governed permanent drivers. Moreover, there is no reason for Airborne to issue discipline letters to casual drivers because its recourse for a casual driver's poor performance is not to give that driver more work.  Thus, Herr was not similarly situated to male permanent drivers regarding disciplinary procedures.

Finally, in considering this wrongful termination claim, it is significant that Jeff Bruer both hired and fired Herr.  There is a strong inference that discrimination was not a motivating factor if the same person hired and fired the plaintiff within a relatively short period of time.  <u>See</u> <u>Rothmeier v. Investment Advisers, Inc.</u>, 85 F.3d 1328,1337 (8th Cir. 1996); <u>Lowe v. J.B. Hunt Transp., Inc.</u>, 963 F.2d 173, 174-75 (8th Cir. 1992).  This inference arises because it is unlikely that the same supervisor would hire a woman, only to turn around and discharge her for that reason.  <u>Cf.</u> <u>Proud v. Stone</u>, 945 F.2d 796 (4th Cir. 1991).  Herr cannot overcome this inference by alleging *without supporting evidence* that Airborne hired her merely to pad its roster of women drivers.

The judgment of the district court is affirmed.

LAY, Circuit Judge, dissenting.

Airborne filed a motion for summary judgment in the district court, alleging the company discharged Herr for a non-discriminatory reason, and Herr failed to show such reason was pretextual.  In doing so, as the district court found, Airborne expressly assumed Herr could make a prima facie showing of sex discrimination.  For this reason, the district judge <u>did not address</u> the issue of whether Herr made a prima facie showing of sex discrimination.  <u>See</u>  Appellant's Appendix at 213, 215 ( reprinting Memo. and Order, <u>Herr v. Airborne Freight Corp.</u>, No. 4:95CV02355 GFG (E.D. Mo. Dec. 31, 1996)).  The trial court ruled Herr failed to establish the existence of a genuine issue

of material fact on the question of pretext, and Herr did not rebut Airborne's proffered nondiscriminatory reason for her discharge. The parties briefed and argued this case on the basis of the district court's ruling.[5]

In this circuit, grounds not raised in the district court shall not form the basis of an appeal. See United States v. One Parcel of Property, 959 F.2d 101, 103 (8th Cir. 1992) (citing In re Pan Am. World Airways, Inc., 905 F.2d 1457, 1462 (11th Cir. 1990) (?[I]f a party hopes to preserve a claim, argument, theory, or defense for appeal, [the party] must first clearly present it to the district court, that is, in such a way as to afford the district court an opportunity to recognize and rule on it."). Despite this fundamental rule, the majority affirms the district court on grounds not raised in that court's ruling: namely, Herr failed to make a prima facie showing of sex discrimination.[6]

This issue is not before this court on appeal. Even if it were, there is ample evidence to support a prima facie case of sex discrimination.[7] To urge otherwise overlooks basic evidence and slights permissible inferences available to Herr, violating the fundamental rule that on motion for summary judgment, the non-moving party is entitled to all favorable inferences. See Hutson v. McDonnell Douglas Corp., 63 F.3d 771, 775 (8th Cir. 1995).

---

[5]Airborne repeated its concessions to this court: ?In this case, Airborne was willing to assume that Ms. Herr had met her initial burden and undertook to demonstrate that she was terminated for a legitimate, nondiscriminatory reason." Appellee's Br. at 8.

[6]Where an issue is not disputed on summary judgment in the district court, the non-moving party is deprived of fair notice if the district court or this court raises the issue sua sponte.

[7]This may explain why Airborne conceded the issue of Herr's prima facie case. Although the evidence is disputed, Herr clearly demonstrated evidence of a prima facie case of sex discrimination sufficient to survive summary judgment.

The majority only draws inferences in favor of Airborne. For example, Herr testified Bruer, her immediate supervisor, told her she had passed the probationary period, and she would be called in as a <u>casual</u> worker. Bruer does <u>not</u> contradict this statement, and for two years, Herr called Airborne seeking casual work, and Airborne continually told Herr there was no work available. This gives rise to an inference that Bruer did make this statement. <u>Cf.</u> <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 156-57 (1970) (allowing inference of conspiracy where police officer did not deny presence in restaurant when management refused to serve white teacher accompanied by six black students, and police officer later arrested teacher outside the restaurant). The majority claims it credits Herr's testimony on this point, yet draws no inference in favor of Herr.

Further, in 1994, the Union filed a grievance on Herr's behalf. Suddenly, Airborne asserted it had terminated Herr two years earlier. To support this assertion, Airborne produced a document dated June 1992, stating Airborne terminated Herr for unsatisfactory job performance.[8] Herr urges Airborne never notified her of the alleged termination, and the majority claims it credits Herr's testimony on this point. Moreover, the majority acknowledges Bruer testified he could not remember whether he notified Herr of her termination. Based upon this evidence, Herr is entitled to the reasonable and favorable inference that Airborne's proffered reason for not assigning her work for two years is pretextual.

Curiously, the only inference the majority draws from Airborne's conduct is that Airborne's "lack of a policy to notify unwanted casual drivers that they have been

---

[8]In its brief to this court, Airborne claims "[f]or reasons unknown to everyone, Ms. Herr apparently did not receive a copy of the termination notice." Appellee's Br. at 5. It seems odd that Airborne would imply Herr should have received a copy of the notice if the termination notice is, as the majority terms it, "an <u>internal</u> business record used to remove an unwanted casual driver from the official list." <u>Supra</u> (emphasis added).

terminated may be an unkind business practice, but it is not evidence of sex discrimination." The majority overlooks that evidence of pretext need not constitute direct evidence of discrimination.  In most instances that is impossible.  The evidence of pretext along with the elements of the prima facie case serve to create a permissible inference sufficient to take the case to the jury.  See United States Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 716 (1983) (?[S]ensitive and difficult" issue of intentional discrimination will frequently be proven by circumstantial evidence of pretext, as ?[t]here will seldom be ‹eyewitness' testimony as to the employer's mental processes.").

Finally, the majority claims Herr cannot overcome the strong inference that sex discrimination was not a motivating factor in her termination since Bruer hired and fired Herr within a relatively short period of time.  Given the peculiar circumstances surrounding Herr's termination, and this court's duty to view the evidence and all reasonable inferences which may be drawn therefrom in the light most favorable to Herr, the non-moving party, see Hutson, 63 F.3d at 775,  I fail to see how the majority can draw this as a controlling inference in favor of Airborne.

This case may not be important legal precedent.  However, it illustrates the unfortunate and pervasive philosophy that the jury is not an important fundamental right of litigants, and that judges can adequately substitute their own findings of fact in summary proceedings.  This is a philosophy to which the law does not subscribe.

Judge John Gibbons, former Chief Judge for the Third Circuit, observed in dissent in a different context:

> Part of my difficulty with the majority's position probably
> results from a perception of the nature of the judicial process
> and the role of juries in that process. . . .  In the process
> of gaining public acceptance for the imposition of sanctions,
> the role of the jury is highly significant.  The jury

is a sort of ad hoc parliament convened from the citizenry at large to lend respectability and authority to the process. Judges are often prone to believe that they, alone, can bear the full weight of this legitimizing function. I doubt that they can. Any erosion of citizen participation in the sanctioning system is in the long run likely, in my view, to result in a reduction in the moral authority that supports the process.

In re Japanese Elec. Products Antitrust Litig., 631 F.2d 1069, 1093 (3d Cir. 1980) (Gibbons, J., dissenting). This statement is particularly apropos to the majority's holding in the present case.

I dissent.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

-11-